```
                UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS


                                  )
UNITED STATES OF AMERICA          )
                                  )
        v.                        )  CRIMINAL NO. 08-10019-PBS
                                  )
OMAR MOHAMED,                     )
           Defendant.             )
                                  )
```

## MEMORANDUM AND ORDER

December 10, 2008

Saris, U.S.D.J.

## INTRODUCTION

Defendant Omar Mohamed, charged with being a felon in possession of a firearm and ammunition, moves to suppress the gun seized when the police pat-frisked him, claiming he was arrested without probable cause.  He also seeks to suppress a later statement to the police on the ground that it was the fruit of an unlawful arrest.  At the evidentiary hearing on October 23, 2008, the government introduced the testimony of Boston Police Patrolman Peter Messina, Sergeant Lucas Taxter, and Detective Paul Schroeder.  After the hearing and a review of the briefs, including supplemental memoranda by both parties, the motion is **DENIED**.

## FINDINGS OF FACT

On October 19, 2007, at approximately 5:45 p.m., Boston Police Patrolman Peter Messina and Sgt. Lucas Taxter, members of

the Codman Square Safe Street Team, were patrolling in the area of Codman Square, a high crime area with multiple shootings and drug dealing.  Patrolman Messina had been on duty in the area on the previous night when there had been a shooting near the intersection of Washington Street and Melville Avenue.  Messina himself had heard the gunshots coming from the area and later learned that an individual had been shot several times at close range inside a pizza shop at 530 Washington Street.  As of the following evening, no one had been apprehended in connection with the pizza shop shooting.

At twilight (about 5:45 p.m.) on October 19th, the night in question, Messina was standing with Sgt. Lucas Taxter, his supervisor, on Washington Street between Aspinwall Road and Lyndhurst Street when they heard five consecutive gunshots.  Like the night before, these shots came from the Washington Street and Melville Avenue area.  They ran on Washington Street toward the gunshots.  When Messina arrived at the corner with Dunlap Street, a car was stopped in the middle of the street.  Messina asked the individual in the car, "Where did he go?," and the individual responded by pointing down Dunlap Street.  Messina then looked down Dunlap Street and saw an individual running; Messina began pursuing the runner who was the suspected shooter in a full sprint.  According to Messina, the suspect was wearing dark clothing and was a light- skinned black male with a tall, thin

build. Messina believed he had on shorts and a t-shirt. As the street curved, Messina lost view of the sprinter. At the corner of the street, Messina slowed down and took a right turn on Whitfield Street.

Meanwhile, Taxter, running down Washington Street toward the gunshots, used his portable radio to notify headquarter operations about the gunshots. He saw an individual walking out of the pizza shop; the individual pointed down Dunlap Street. Taxter then saw a security guard in another shop crouched down in the doorway with his weapon drawn. Taxter asked the guard if anyone was hurt; the guard shook his head "no," but also pointed down Dunlap Street. Taxter then saw Messina running ahead of him on Dunlap and a man ahead of Messina running as well. According to Taxter, the man in front of Messina was wearing a black top with a hood. Taxter followed Messina, turned right onto Whitfield Street, and immediately shouted for Messina to stop.

On Whitfield Street, a female at a two-family house on the second floor porch pointed down the driveway of a house at 92 Whitfield Street. Taxter also saw a man on the same second floor porch motioning toward that driveway. The men waited at the top of the driveway for backup. Detectives Paul Schroeder and Steven Beath arrived soon thereafter (within seconds, according to Messina).

Believing the suspect was in the rear of 92 Whitfield, Messina and Taxter proceeded down the right side of the driveway (with the house at 92 Whitfield on their right) with guns drawn. Schroeder proceeded down the left-hand side of the driveway. Schroeder, who had his gun out, saw an individual (Defendant) crouched down, with a cell phone in his hand, looking through the slats of a banister beneath a back deck.  The defendant was wearing a black hooded sweatshirt and dark pants.  Schroeder yelled out, "Boston Police" and "Get on the ground."  Defendant dropped the cellphone and immediately lay down on the ground with his hands out.

Messina handcuffed and then frisked Defendant.  When he found a gun, Messina yelled, "He's got a gun" or "Gun." Defendant began flailing; two other officers helped Messina subdue him and rolled him onto his side, at which point Taxter removed the gun from the defendant's pants pocket.  The gun was a revolver, a .38 caliber.  It smelled as if it had been recently fired.  The chamber indicated that all five bullets had been fired.

Defendant was wearing a black hooded sweatshirt and jeans and was sweating profusely.  Because Defendant was wearing different clothing than Messina believed the man he had been chasing to be wearing, Messina initially put out a message over the radio that there may be another suspect wearing a t-shirt and

shorts.  However, Messina testified that, when he later saw Defendant standing up and observed his body type (body shape, hair, and complexion), he believed that Defendant was the same person he had been chasing.  Messina then cancelled the dispatch.

As Defendant was picked up by the police from the ground, a bag of drugs (ten rocks of crack cocaine) dropped from his person.  Defendant, found with both a gun and drugs on his person, was placed under arrest, taken to the station, and booked.

## DISCUSSION

I find that the police had reasonable suspicion to believe that Defendant may have been involved in the shooting, and therefore to briefly stop Defendant to investigate further.  See generally Terry v. Ohio, 392 U.S. 1, 22 (1968) (holding that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest"); Flowers v. Fiore, 359 F.3d 24, 29 (1st Cir. 2004) (explaining that the Terry exception allows officers to "make brief investigative stops and detain individuals upon reasonable suspicion that they may have committed, are committing, or are about to commit a crime"). While there are some discrepancies in the testimony, the factual scenario is largely straightforward.  The police heard gun shots,

ran in the direction of the shots, saw a man running, and subsequently chased him. Numerous people all pointed out the direction the suspect was running. Although the officer briefly lost sight of the man, people at a nearby house signaled to the officer by pointing to a nearby driveway. The suspect was in the precise location where two people on the second floor deck on the corner house pointed. The man was crouching, while on his phone. The wrinkle is that Messina originally believed that the runner who was the suspected shooter had on different clothing than the man behind the house was actually wearing. Still, in the totality of the circumstances, the police in hot pursuit had ample suspicion for a <u>Terry</u> stop.

   Defendant contends that the police officers' manner of detention – including ordering Defendant to the ground with guns drawn, handcuffing him, and pat-frisking him – constitutes a <u>de facto</u> arrest undertaken without probable cause and thus in violation of the Fourth Amendment. The critical question is whether the coercive actions used by the officers when detaining Defendant caused the <u>Terry</u> stop to morph into an arrest. "There is no litmus-paper test to determine whether a particular detention goes beyond a <u>Terry</u> stop and amounts to a <u>de facto</u> arrest." <u>Flowers</u>, 359 F.3d at 29 (internal quotation marks omitted). While the First Circuit generally employs a "reasonable man" test when evaluating such situations, it has

stated that, "borderline case[s] where the detention at issue has one or two arrest-like features" require a "fact-specific inquiry into whether the measures used by the police were reasonable in light of the circumstances that prompted the stop or that developed during the course of the stop." Id. at 29-30; see Washington v. Lambert, 98 F.3d 1181, 1185 (9th Cir. 1996) (suggesting that the same police actions can constitute a de facto arrest in some circumstances but not others), cited with approval in United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998). The inquiring court must consider the totality of the circumstances. United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004).

Here, the police did use several "arrest-like" measures when they detained Defendant in the backyard of 92 Whitfield Street. The caselaw is clear that none of these actions – ordering Defendant to the ground with guns drawn, handcuffing him, and pat-frisking him – automatically transform a Terry stop into a de facto arrest. See United States v. Fornia-Castillo, 408 F.3d 52, 64 (1st Cir. 2005) ("[N]either the use of handcuffs nor the drawing of a weapon necessarily transforms a valid Terry stop into a de facto arrest."); Maguire, 359 F.3d at 77-79 (noting that neither the use or display of a weapon, nor the fact that a suspect is placed on the ground, nor the use of a pat-frisk necessarily imply that the scope of a Terry stop was exceeded).

Such actions may be taken by officers during an investigative Terry stop to protect themselves or others "if the circumstances reasonably warrant such measures." Flowers, 359 F.3d 24 at 30 (holding that, when officers had information that a suspect was armed and a crime of violence may soon occur, their use of handcuffs did not cause an investigatory stop to cross over into an arrest). The government, however, bears the burden of pointing to specific facts or circumstances which justify the particular coercive actions taken in the name of officer or public safety:

> [W]e . . . have required the government to point to some specific fact or circumstance that could have supported a reasonable belief that the use of such restraints was necessary to carry out the legitimate purposes of the stop without exposing law enforcement officers, the public, or the suspect himself to an undue risk of harm.

Id. at 30 (internal quotation marks omitted).

The government has satisfied this obligation. In the totality of these circumstances, the police had valid concerns for their safety during the investigatory stop. They were walking down a dark driveway after a man they reasonably believed had just used a gun. Drawing one's gun was a precaution warranted under these circumstances, as was the decision to handcuff and pat-frisk the defendant even as he lay on the ground. At first, Messina was the only officer touching Defendant as he lay on the ground; the other officers only

intervened when Defendant began struggling and resisting once Messina discovered a firearm in Defendant's pocket.  Moreover, they were in a residential neighborhood with bystanders nearby, increasing the risk of harm to the public.

Defendant suggests that the pat-frisk, in particular, was unnecessary and impermissible, but this position is unsupportable.  In order to justify a pat-frisk during a Terry stop, an "officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."  Terry, 392 U.S. at 27.  The facts that no officer testified that they saw a bulge in Defendant's pocket and that, at the point the officers initiated the frisk, Defendant had not made any offensive moves, are simply not enough to overcome what is clearly a reasonable belief by the officers that Defendant could have been armed.[1]

I conclude that Defendant's detention was a valid investigatory stop.  All means (the drawn guns, ordering Defendant to the ground, handcuffs, and pat-frisk) were, under these specific circumstances, reasonable to determine whether the suspect was armed and to counter any threat of physical harm.

---

[1] Moreover, Defendant was lying on the ground, a position he had assumed immediately once the officers arrived and from which it would be unlikely to detect a bulge in a front pocket.

**ORDER**

The motion to suppress is **DENIED**.

                                          /s/ Patti B. Saris
                                          PATTI B. SARIS
                                          United States District Judge